HAMITER, Justice.
In the instant cause Sonnier Electric Company, Inc., a sub-contractor, seeks to recover from the contracting partnership of J. M. Brown Construction Company and its individual partners (all hereinafter referred to as the defendant) the sum of $4695.10 for losses allegedly sustained as a result of a work stoppage occurring at a certain federal government project. The district court awarded plaintiff $3620.32 and the defendant appealed. Plaintiff has answered the appeal, praying for an increase of $1074.78.
On May 20, 1952 the defendant entered into a written contract with the United States of America through the Corps of Engineers of the United States Army, for the construction of air craft and base shops at the Lake Charles Air Force Base, Lake Charles, Louisiana, the work to be performed in accordance with prepared plans and specifications. Contained in the specifications, as paragraph GC-11 of the “General Conditions” section thereof, was the following recitation:
“Suspension of Work. — The contracting officer (government representative) may order the contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. * * * In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the contractor, the contracting officer shall make an equitable adjustment in the contract price and modify the contract accordingly. * * * ” (Parenthesis ours)
On May 22, 1952 the defendant granted a sub-contract to plaintiff for the execution of the entire electrical work on the project, it being in the form of a written purchase order signed by both parties. This instrument made reference to the aforementioned prime contract and particularly provided: “We accept your proposal for the electrical work on the above mentioned job according to plans and specifications, with attention to the General and Special Condition Sections of the specifications, as prepared by the Corps of Engineers * * *.”
On April 24, 1953, under the authority of the above quoted paragraph GC-11 of the specifications and while construction was in progress, the government suspended work on the fabric and paint room of the base shops. Some three and one-half months later the suspension was lifted and the defendant was notified in writing to recom- *501 menee the construction on August 24, 1953. Whereupon, the defendant sent the notice to plaintiff, along with a letter of transmittal which made reference to the prime ■contract and stated that the district engineer’s communication was self-explanatory.
Upon receipt of this letter plaintiff complained to the defendant in writing about the additional expense to it caused by the stoppage, and it requested that a representative come over “and help use get this straightened out.” In a reply letter the defendant specifically called attention to the •suspension specifications under the prime •contract, which gave the contracting officer the right to suspend any or all of the work and thereafter to make an equitable adjustment in the contract price, and it admonished that if activities were not re•commenced at once plaintiff’s bonding company would be notified.
As directed, plaintiff resumed the electri•cal work and completed it in accordance •with the sub-contract. Meanwhile, at defendant’s request, it submitted a tentative •estimate of its losses due to the stoppage in the amount of $500.98.
Subsequently, one of defendant’s partners met on several occasions with representatives of the Corps of Engineers in an effort •to make an adjustment under the contract. Plaintiff’s president, as well as others, attended one of these meetings. During the ■negotiations (while plaintiff’s president was in attendance) the defendant submitted an electrical loss claim for plaintiff of $3620.-32. Thereafter, plaintiff sent to the defendant an invoice for that amount.
As a result of the negotiations the fed•eral government, in due course, paid to the defendant the sum of $30,052.40 (in addition to the original contract price), this being for the following itemized stoppage losses:
“a. Mechanical Work $10,171.20
b. Electrical Work 4,695.10
c. Prime Contractor Work,
overhead on subcontract work 1,114.95
■ d. Prime Contractor costs 14,071.15”
However, the defendant tendered to plaintiff only the sum of $500.98. The tender was refused, and this suit followed.
Initially, plaintiff demanded $3620.32. Later, through an amendment to the petition, it prayed for $4695.10 — the amount received by defendant from the government for the electrical work losses. The theory of the demand is that the specifications under the prime contract (particularly those relating to work stoppage by the government) were a part of plaintiff’s subcontract with the defendant (made so by reference), it having recited that the electrical work should be performed in accordance with the prime contract’s plans and specifications; that the sub-contractor was bound by such suspension specifications; and that, therefore, plaintiff is entitled to whatever the contracting officer of the Corps of Engineers allowed for stoppage losses in the electrical work.
Defendant, on the other hand, takes the position that it was under no contractual obligation whatsoever to pay anything to plaintiff for work stoppage, and that the only reason it tendered the $500.98 was that it “had agreed to pay same.” Specifically, it argues: “J. M. Brown Construction Company was under no contractual liability to plaintiff for the loss or damage sustained by it.”
While it is true that there was no privity between plaintiff and the United States Corps of Engineers, such as would authorize a demand for damages by the former against the federal government, clearly specifications paragraph GC-11 under the prime contract were applicable as between plaintiff and defendant, for by reason thereof the sub-contractor was required and could be compelled to submit to any work suspension ordered by the government. This being so it is entitled to whatever the contractor collected as work stoppage losses under the electrical sub-contract.
*502 With further reference to the mentioned suspension specifications as between these parties, we observe that the defendant recognized their applicability both in the written sub-contract and in the afore-described correspondence; also, that the Corps of Engineers had allowed less than the actual loss under the electrical subcontract the plaintiff, because of such provisions, would have been limited in its claim against the defendant to the amount thus allowed.
Defendant further contends that plaintiff, in this suit, has not proved its actual losses. In our opinion the record contains sufficient proof on this point. L. R. McClung, a field engineer employed by the defendant during the period in question, testified that after plaintiff had submitted its first estimate ($500.98) its was notified by the home office of the defendant that its loss claim should be increased. Again, Mr. J. N. Barineau, Jr., one of the partners of the defendant who handled the settlement negotiations with the Corps of Engineers, gave the following pertinent testimony relative to plaintiff’s work stoppage losses:
“Q. Let me ask you this, and this is the point I am interested in — When you filed your claim with the Government did you itemize on that claim so much for electrical sub-contracting work? A. Yes, sir, you might say it was electrical work; as far as the government is concerned there is no sub-contractor.
“Q. Did you have any other electrical concern doing electrical work besides Sonnier? A. No, sir.
“Q. How much did you put in a claim for with the Government for the electrical sub-contract? A. On my estimate ?
“Q. Yes? A. $3620.00.”
Surely, by this testimony the defendant itself admitted, and thereby conclusively established, that the losses to plaintiff were at least $3620.
But plaintiff has not proved with legal certainty the additional loss of $1074.78 claimed by it on the electrical sub-contract. This is particularly true in view of the allegations of paragraph 11 of its original petition which are: “That as hereinabove shown, said $4,695.10 paid as expense and loss by reason of suspension of electrical work represented $3,620.32 as expense and loss to petitioner, and $1,074.78 as expense and loss, to J. M. Brown Construction Company.” Consequently, we cannot • increase the award as prayed for in the answer to the defendant’s appeal.
For the reasons assigned the judgment appealed from is affirmed.
SIMON, J., absent.